**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **EVENT STRATEGIES, INC.**<br><br>    Plaintiff,<br><br>v.<br><br>**JOHN DOE BANK.**<br><br>    Defendant. | Civil Action No._____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Event Strategies, Inc. ("ESI"), by and through its counsel, Graves Garrett LLC and Cook Craig & Francuzenko, PLLC, for its Complaint against Defendant John Doe Bank ("Bank"),[1] states and alleges as follows:

1.  This is an action to protect Plaintiff from a Congressional subpoena (the "Subpoena") that lacks a lawful purpose and seeks to invade the Plaintiff's constitutional rights to privacy. Plaintiff is a private company who was not involved in any federal government activities or programs. It has only one apparent connection to the matter Congress claims to be investigating: it served as a vendor to help staff a peaceful, lawful, orderly and patriotic assembly to promote First Amendment-protected speech. Despite this, Plaintiff's principal voluntarily sat for lengthy interviews and produced documents to Congressional investigators. Plaintiff's principal answered every single question about Plaintiff's role in the event, what happened at the event, who spoke, and when. Plaintiff's principal also produced its bank records for the only transactions that could possibly be relevant to Congress's inquiry. If Congress wanted to know anything more about

---

[1] Contemporaneously with this Complaint, Plaintiff is filing a Motion to permit the Defendant Bank to proceed pseudonymously to prevent harm to Defendant Bank and to Plaintiff, and for the additional reasons stated in that Motion.

Plaintiff's involvement with the events it is allegedly investigating, it needed only have asked. Instead, Congress rewarded Plaintiff for its cooperation by pivoting to Defendant Bank, Plaintiff's primary financial institution, to indiscriminately demand detailed information about its accounts and financial transactions. On information and belief, the Subpoena requests a broad range of documents spanning a fourteen-month period from October 1, 2020 to the present.

2. The U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") issued the Subpoena to Defendant Bank in late November but, on information and belief, the Select Committee encouraged Defendant Bank not to provide reasonable or timely notice to Plaintiff so that the Select Committee could obtain the requested materials without an opportunity for Plaintiff to intercede to protect its rights. Though Plaintiff was just notified four days ago of the Subpoena and the Bank's intent to comply with the same, Plaintiff appears here to protect its confidential information from the Select Committee's overbroad and overreaching subpoena.

3. This Subpoena was not issued by a validly constituted committee; is not pertinent to the matter Congress is purporting to investigate; does not pursue a legislative purpose; and violates Plaintiff's First and Fourth Amendment rights. Plaintiff seeks a judgment declaring that the Subpoena is invalid and enjoining Defendant Bank from producing the information sought by the Subpoena to the Select Committee.

## THE PARTIES

4. Plaintiff Event Strategies, Inc. is a Delaware stock corporation with a principal office address in Virginia at 510 King Street, Suite 410, Alexandria, VA, 22314. On December 10, 2021, ESI received a letter from Bank advising ESI that Bank had received the Subpoena from the Select Committee and that Bank intended to comply with the Subpoena on December 14, 2021.

5. Defendant John Doe Bank has a principal place of business in Virginia. It is from this address that Bank addressed its letter to Plaintiff advising it of the Subpoena and Bank's intent to comply with the same.

## JURISDICTION AND VENUE

6. This case challenges the validity of a Subpoena issued by a body calling itself the Select Committee to Investigate the January 6 Attack on the United States Capitol (the "Select Committee"). It raises claims regarding the scope of the investigative power of Congress under Article I of the United States Constitution and claims arising under the Fourth Amendment to the United States Constitution.

7. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343.

8. The Court has personal jurisdiction over Defendant Bank because its principal place of business is in Virginia, and its acts in responding to the Subpoena, communicating with Plaintiff about the Subpoena, and, potentially, in producing information responsive to the Subpoena, were or will be undertaken in and from Virginia.

9. For the same reasons this Court has personal jurisdiction, venue in this Court is proper under 28 U.S.C. § 1391(b).

## BACKGROUND ALLEGATIONS

10. On January 6, 2021, a group of protesters breached the Capitol grounds, entered the Capitol, and, by causing disorder, successfully delayed the certification of the votes of the electors for the 2020 presidential election by several hours.

11. On June 30, 2021, the House of Representatives passed H. Res. 503 (the "Resolution"), establishing "the Select Committee to Investigate the January 6th Attack on the United States Capitol." The Resolution was passed just two days after its introduction, with two Members caucusing with Republicans voting "yea."

12. Under Section 2(a) of the Resolution, "the Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." The Resolution also required that "[t]he Speaker shall designate one Member to serve as chair of the Select Committee." H. Res. 503 § 2(b), 117th Cong. (2021).

13. The Speaker appointed only 9 Members to the Select Committee. The Speaker did not appoint any Members after consultation with the House Minority Leader, Representative Kevin McCarthy. Rather, the Speaker appointed the only two Members who currently caucus with the Republican Party and who had voted for the Resolution. The Speaker failed to appoint any Member suggested by the House Minority Leader.

14. The Speaker did not appoint a Ranking Member. The Select Committee does not have a Ranking Member.

15. The Resolution identifies a total of three "purposes" of the Select Committee. They are: (1) to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021 domestic terrorist attack on the United States Capitol Complex… and relating to the interference with the peaceful transfer of power, including the facts and causes relating to the preparedness and response of [law enforcement and other instrumentalities of government], as well as the influencing factors that fomented such an attack…"; (2) to "examine and evaluate evidence developed by relevant Federal, state, and local government agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack"; and (3) to "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other [investigations] into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack."

16. The Resolution identifies a total of three "functions" of the Select Committee. They are: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding" various federal governmental operations; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

17. Subsection (c) of Section 4 describes three categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

18. The Select Committee has established a website that reports on its proceedings and publishes statements by the Select Committee's Speaker-designated Members—that is, the Select Committee's only Members. See https://january6th.house.gov/

19. The Select Committee held its first and only hearing on July 27, 2021.

20. In late September, 2021, the Select Committee publicized with fanfare its issuance of subpoenas to Plaintiff's principal for the production of documents and depositions. *See* https://january6th.house.gov/news/press-releases/select-committee-subpoenas-organizers-rallies-and-events-preceding-january-6th.

21. Letters signed by the Select Committee Chairman, which accompanied the subpoenas claimed that Plaintiff's principal's testimony and documents were relevant because

5

Plaintiff had acted as a vendor for the Ellipse Rally held earlier on January 6, 2021, in front of the White House.[2] This first round of subpoenas made sweeping demands for documents to be produced in less than two weeks after service. They also demanded depositions within less than 30 days.

22. In an apparent effort to tie the Ellipse Rally to the Capitol breach, the Letters reported comments made by President Donald Trump and other speakers at the Ellipse Rally or in the weeks before the Ellipse Rally. At no point, however, did the Letters suggest that the President, any speakers at the Ellipse Rally, any participants or attendees at the Ellipse Rally, or Plaintiff itself engaged in any conduct at the Ellipse Rally other than peaceful, First Amendment-protected speech and assembly. At no point did the Letters suggest that the Select Committee lacked any information about who actually spoke at the Ellipse Rally, what was said there, or what happened there.

23. Despite the weak case the Letters made for this round of subpoenas, Plaintiff's principal recognized that the Select Committee's members had made numerous public threats that anything other than complete and immediate cooperation would result in a finding by the Congress of criminal contempt. Further, statements by officers in the Executive Branch—which would be tasked with making a final decision as to whether to charge any witness who failed to precisely meet the subpoenas' terms—raised questions about whether the Department of Justice would be exercising independent prosecutorial discretion.

24. Confronted with these threats and faced with the wave of publicity the Select Committee had generated regarding their subpoenas, Plaintiff's principal cooperated by producing

---

[2] https://january6th.house.gov/sites/democrats.january6th.house.gov/files/210929%20Tim%20Unes%20Letter.pdf

documents and testimony. Plaintiff's principal did, however, assert pertinence, legislative purpose, and First and Fourth Amendment objections to questions about their political beliefs and political discussions with colleagues, questions asking them to speculate about what other people had intended in their remarks about individuals who had been considered and then rejected as Ellipse Rally speakers, pre- Ellipse Rally discussions with Ellipse Rally organizers about the content and speakers for the Ellipse Rally, and lists of attendees and "VIPs" who attended the Ellipse Rally. Plaintiff's principal withdrew almost all of these objections when it became clear that other Ellipse Rally witnesses no longer desired to assert constitutional protections over this information and had already produced it.

25. Regardless, neither ESI nor its principal objected to any questions about who actually did speak at the Ellipse Rally, what they saw, heard, and otherwise witnessed at the Ellipse Rally and its aftermath, and whether certain individuals were at the Ellipse Rally. ESI and its principal fully disclosed who paid them and who they paid to work at the Ellipse Rally, although they redacted account numbers and personal and confidential contact information without objection by the Select Committee.

26. Plaintiff's financial information relevant to the Ellipse Rally, the Select Committee's asserted connection between Plaintiff and its inquiry, has already been produced to the Select Committee.

27. The voluminous documents and interview responses regarding ESI's and its principal's activities showed that the Ellipse Rally was nothing other than a peaceful, lawful, First Amendment-protected assembly for the purposes of engaging in political speech.

28. The Select Committee focused much of its questioning on the possibility of a "march" to the Capitol. Although some speakers at the Ellipse Rally had planned to mention a

"march" to the Capitol (and President Trump did ask attendees to go to the Capitol, albeit in a peaceful manner), no planning or organizing was actually done by those who would have been tasked with doing this—the event organizers and vendors—to stimulate a march or make one logistically possible.

29. The term "march" is often used to brand political events in Washington, D.C. But true marches are rare. Without careful and detailed planning, it is difficult, if not impossible, to cause any significant number of people to move together from one location to another. A true march requires substantial organization and set-up. It also requires continuing guidance to keep people moving together.

30. The Ellipse Rally perimeter was not set up with entrances and exits to allow a mass movement of people in the direction of the Capitol. Organizers were not identified, and way stations were not set up along a set route, to encourage and aid a mass movement of people. Nothing was done at the conclusion of the Rally to actually organize, gather, and summon people to move together or to follow along a set route to the Capitol.

31. For all of these reasons, among others, those who were on hand observed that as the Rally attendees filtered out of the Ellipse perimeter, over a mile from the Capitol, no mass surge or march did in fact start from the Rally and lead into a Capitol attack. The documents and testimony did not show that Trump supporters arrived at the Rally and surged out, emotionally charged and incited, primed to attack the Capitol. Instead, the documents and testimony showed that the Rally began and ended in a peaceful manner, no different from any other Trump campaign event.

32. The Select Committee also expressed interest in exploring whether Rally organizers' communications with National Park Service and other officials provided adequate

notice that many people would be in Washington, D.C. on January 6th, and that it was likely that many would congregate on the National Mall and, eventually, around the Capitol grounds, where at least one other rally had received a permit. Yet the Select Committee—which for six months has had full access to law enforcement and National Park Service documents—already knows that the Ellipse Rally organizers fully and effectively communicated with law enforcement. For example, the morning of January 6, a Department of Homeland Security ("DHS") email shows that a Regional Director of the Federal Protective Service remarked that "we are tracking three major rallies," including the Ellipse Rally, where President Trump was scheduled to speak, and where approximately 20,000 people would attend. DHS "expected that a portion of this group will march to the U.S. Capitol prior to 1300 hours." In fact, the Ellipse Rally was unable to accommodate 20,000 people within the perimeter due to the slow pace of magnetometer (metal detector) screening, and as it turned out, there was not a "march" of any significant number of people from the Ellipse Rally.

33. Additionally, the Select Committee has long had access to the results of a separate investigation of the events of January 6 that has been conducted by the Federal Bureau of Investigation. That investigation has focused on the individuals who actually breached the Capitol on January 6. At no time has that investigation suggested that there was any centralized organization or planning for the breach, that Plaintiff or its principal could conceivably have information about anyone who performed that role, or that Plaintiff or its principal ever had contact with such a person. The Select Committee already knows that Plaintiff could not possibly have had contact with individuals who planned or participated in the Capitol breach.

34. The document production and interview process with Plaintiff's principal was an opportunity for the Select Committee to fully explore these questions, but even this exhaustive

9

effort was just a small fraction of the Select Committee's inquiry. Since June 2021, the Select Committee claims to have interviewed 250 witnesses. See https://january6th.house.gov/news/press-releases/thompson-cheney-opening-statements-rules-committee-meeting-0. In short, with respect to the Ellipse Rally, there can be little if anything that is not known to the public or the Select Committee. That is certainly true regarding any information the Plaintiff may have.

35. Nonetheless, sometime prior to December 10, 2021, the Select Committee issued a Subpoena to Defendant Bank. On information and belief, that Subpoena demanded production of all of Plaintiff's bank records, financial transactions, and related documents from October 1, 2020 to present.

36. Defendant has not provided a copy of the Subpoena to Plaintiff but notified Plaintiff just four days ago – on December 10, 2021 – of the Subpoena's existence and that it intends to comply with the Subpoena and turn over a vast tranche of Plaintiff's financial information to the Committee.

37. Despite the fact that Plaintiff's involvement with the Ellipse Rally spanned only 10 to 14 days in late December 2020 and early January 2021, the Select Committee seeks its financial and banking data for a fourteen-month period: from October 1, 2020 to present.

38. The Select Committee is clearly engaging in a fishing expedition to obtain the identity of Plaintiff's clients, regardless of whether those clients or the transactions with them had anything to do with the Ellipse Rally or any other event related to January 6.

## Count I
(**Subpoena Is Invalid Because the Select Committee Is Not Properly Constituted**)

39. Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–38 as if the same were set forth verbatim herein.

40. The power of authorized congressional committees to issue subpoenas arises by implication from Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).

41. The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

42. The Speaker of the House failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine Members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs that the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).

43. Further, of those nine Members the Speaker has appointed, none of them was appointed after consultation with the Minority Leader, as is required by Section 2(a) of the authorizing resolution.

44. The composition and membership of a purported committee, including the Select Committee, is material to its power to act. A committee's composition and membership can determine the direction of an inquiry and can serve to check, or temper, committee actions that could otherwise prove injurious to the operation of the government or the rights of private citizens. A committee that, without any check, exclusively serves the political purposes of one political party or faction is susceptible to grave constitutional error and overreach.

45. Here, the Select Committee has embarked upon an investigation that began with an inquiry into January 6th, but, in the absence of any tempering influence from the opposition party, has transformed into a broad assault on the Select Committee's political opponents, including private citizens and private companies

46. The Select Committee's failure to ever become properly constituted is a material violation of its authorizing Resolution. A private citizen aggrieved by a material violation of House

rules has a defense against compulsory process. In *Yellin v. United States*, 374 U.S. 109, 114 (1963), the House Unamerican Affairs Committee failed to follow Rule IV, which required the committee to weigh certain considerations and act upon the express request of Yellin, the witness, for executive session because he believed his public testimony would harm his reputation. The Court held that because the committee had not followed Rule IV, Yellin could not be convicted for contempt of Congress for failing to answer questions about his political affiliation and activities. It was not necessary to the Court's decision in *Yellin* that the committee would or should have granted Yellin's request for private, executive session testimony; the holding rests upon the committee's failure to actually apply Rule IV in considering his request. As *Yellin* shows, then, the House's failure to follow a rule is particularly significant where a person's fundamental rights are involved. That is the case here, where Plaintiff's First and Fourth Amendment rights have been placed under continual pressure.

47. Thus, because the Select Committee as it currently stands—and stood at the time it issued the Subpoenas in question—is not a duly constituted Select Committee under the applicable Resolution, it has no authority to act by issuing compulsory process against private entities and citizens. The Subpoena to Defendant is invalid and unenforceable.

## Count II
### (Subpoena Is Not Pertinent to the Authorized Inquiry)

48. Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–47 as if the same were set forth verbatim herein

49. The Committee's supposed inquiry focuses on the events of January 6 leading up to the Capitol breach, factors that may have caused individuals to enter the Capitol without permission, and the statutory process of certifying states' electoral votes.

50. Plaintiff was a vendor for one peaceful event that took place earlier on the day of January 6, 2021, at a location other than the Capitol. Plaintiff's bank account information, particularly that from months before January 6 and in the nearly 12 months since, cannot aid Congress in drafting legislation about the January 6 Capitol breach, its causes, or the statutory process for transferring power. The same is true of the Plaintiff's complete record of financial transactions with other politicians, campaigns, and causes which were wholly unrelated in time and purpose to the events of January 6.

51. The theory of Congress in investigating Plaintiff and its principal is that they each had some role as outside vendors for the Ellipse Rally at which President Trump spoke. There was no evidence adduced from Plaintiff or its principal, and upon information and belief there is no evidence from any witness, that these Plaintiff participated in or planned to organize an attack on the Capitol. Nor was there any evidence that Plaintiff or its principal participated in or planned even a peaceful assembly—a "march," copying the parlance of numerous public gatherings held on the National Mall—to the Capitol.

52. There was no evidence from Plaintiff or its principal, and upon information and belief, there was no evidence from any other witness, that Plaintiff or its principal participated in or planned speeches that were directed to, and were likely to, incite any kind of imminent unlawful activity.

53. And there was no evidence from Plaintiff or its principal, and upon information and belief there was no evidence from any other witness, that anyone's speech at the Ellipse Rally actually led to an atmosphere of hatred, violence, or lawlessness, sufficient to cause otherwise peaceful attendees to surge to the Capitol and break in.

54. The Select Committee claims to have already spoken with over 250 witnesses. See https://january6th.house.gov/news/press-releases/thompson-cheney-opening-statements-rules-committee-meeting-0. Upon information and belief, it has reviewed hundreds of thousands or millions of documents that it has received from those witnesses. It is far past the outset of its investigation, and it is long past time for the Select Committee to have adduced the kind of evidence relating to Plaintiff that would suggest it is a core subject of the investigation, justifying the unusual step of Congressional subpoenas for bank and financial records despite Plaintiff's principal's cooperation in producing the only records relevant to the Ellipse Rally and/or January 6.

55. Further, Congress has already received a production of records from Plaintiff's principal and has had as much time as it wanted—many hours at a time, with multiple counsel and staff asking questions at the same time—to interview Plaintiff's principal. There is no reason to believe Plaintiff still has personal knowledge about the Ellipse Rally that was not fully explored in the document review or interviews. There is no reason to believe that the full record of financial transaction of Plaintiff, extending for over two months before the Rally (long before it was even a remote possibility) and continuing for over 11 months since, is necessary to supplement their fulsome explanation of the events of the Rally and leading up to it.

56. Plaintiff did not learn of the potential for what became the Ellipse Rally until after Christmas, and its involvement was largely complete on the day of (January 6), or a few days after, the Ellipse Rally. Yet the Subpoena purportedly requires over a year's worth of financial records to satisfy the Select Committee's untethered thirst for its political opponent's information.

57. Plaintiff's banking information over a fourteen-month period is not pertinent to any inquiry into what happened on January 6, or its causes. Instead, it is an impermissible attempt to

harass Plaintiff, identify its close colleagues and entire client list, and potentially subject those Clients to additional harassment and subpoenas. Not only does this chill communication among these friends and political associates, it builds an opposition research file for the 2022 election cycle for the single party that mans, staffs, and controls the Select Committee.

58. This sweeping demand for Plaintiff's financial information is not pertinent to the matters the House assigned to the Select Committee. *See, e.g., Watkins v. United States*, 354 U.S. 178, 207-208 (1957) (the specific demand must be "pertinent to the question under inquiry"). For this reason alone, the Subpoena should be quashed.

## Count III
### (Subpoena Lacks a Legislative Purpose)

59. Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–58 as if the same were set forth verbatim herein

60. A subpoena must not only be pertinent to the matter under investigation, it must be directed to produce facts relevant to a subject on which legislation may be had. *Trump v. Mazars USA, LLP,* 140 S.Ct. 2019, 2031 (2020) (regardless of whether a congressional subpoena is directed to the Executive branch or a private citizen, it must "concern[] a subject on which legislation could be had," and cannot "expose for the sake of exposure" or serve the purpose of "law enforcement"); *Quinn v. United States*, 349 U.S. 155, 161 (1955) (Congress cannot exercise "any of the powers of law enforcement" because "those powers are assigned under our Constitution to the Executive and the Judiciary…").

61. The House originally suggested that its inquiry into the "causes" of January 6 was intended to support potential legislation relating to Capitol security and the process of certifying electoral votes on January 6. More recently, it supplemented its list, claiming to be interested in passing legislation on "election integrity."

62. In response to this Complaint and a stiffening legal response from other targets of compelled disclosure of purely private affairs, the Select Committee might suggest new legislative purposes. But no conceivable area of election-related legislation justifies the compelled disclosure of purely private affairs. Congress does not truly lack the necessary background factual record, and it does not need to threaten private citizens with jail time so that it can craft wise election legislation. For example, the Select Committee may claim that we can minimize the risk of another January 6 by banning or limiting rallies such as those that occurred such as Ellipse and elsewhere, or by banning or limiting criticisms of election processes after the election. First, any such legislation would need to be within Congress's power under the First Amendment, a stumbling block to any sort of prior restraint or viewpoint or content-based restriction on speech or assembly. Second, assuming for the sake of argument that any such constitutionally-permissible legislation can be conceived, it would necessarily cover an exceedingly narrow field. Within that field, Congress does not truly lack the information it needs to legislate. Whether the legislative purpose is Capitol security or election integrity, Plaintiff's private financial transactions, particularly those with clients and candidates engaging in core political speech, are not part of the pertinent inquiry.

63. Additionally, even if it were true that any of these legislative purposes are actually being explored by the Select Committee, they do not have any relationship to fourteen months of Plaintiff's bank records. There is no conceivable link—even a highly attenuated chain—between, say, the account and payment information from Plaintiff, and any Capitol security measures that may be passed. Rather than aiding Congress in weighing some hypothetical legislation, the financial and client information will be used to further harass Plaintiff and its clients, chill their association with personal and political acquaintances, build an opposition research file for 2022 for the party that completely runs the Select Committee without any involvement from the

minority, and chill talented people from lending their skills to the Select Committees' political opponents. Because "recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation," *Mazars*, 140 S.Ct. at 2031, this abuse of Congressional power renders the Subpoenas unenforceable.

### Count IV
### (Subpoena Violates the Fourth Amendment)

64. Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–63 as if the same were set forth verbatim herein.

65. Under the Fourth Amendment, Plaintiff has a reasonable expectation of privacy in its banking and financial information, including to the extent that the information reveals who its personal and political contacts are, and potentially what activities they have associated to undertake. That is, Plaintiff and the public at large do not expect that Congress can simply obtain from their banks, and then potentially disclose, their entire set of financial transactions for a fourteen-month period, particularly when the purported goal is to reveal information relevant to a distinct, limited point in time.

66. Congress violated that reasonable expectation of privacy by indiscriminately seeking a mass of banking and financial records that cannot have anything to do with the Capitol breach, the Ellipse Rally, or any legitimate purpose of the Committee.

67. The Subpoenas should not be enforced as violative of the Fourth Amendment. *See Carpenter v. United States*, 138 S.Ct. 2206 (2018).

### **Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against the Defendant as follows:

1. A declaratory judgment that the Subpoenas are invalid and unenforceable;

2. A permanent injunction quashing the Subpoenas;

3. A permanent injunction prohibiting Defendant from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the Subpoenas;

4. Plaintiff's reasonable costs and expenses, including attorneys' fees; and

5. All other preliminary and permanent relief to which Plaintiff is entitled.

Dated: December 14, 2021               Respectfully submitted,

**COOK CRAIG & FRANCUZENKO, PLLC**

_____/s/_____
Christopher T. Craig (VA Bar No 36983)
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
(703) 865-7480
ccraig@cookcraig.com

**GRAVES GARRETT, LLC**

Edward D. Greim (Mo. Bar #54034)*
1100 Main Street, Suite 2700
Kansas City, MO 64105
Phone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiffs*